IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

MARINA VANYAN,            )
                               )
       Plaintiff,    )
                               )
   v.                 )    1:13cv171 (LMB/IDD)
                               )
CHUCK HAGEL, in his official )
  capacity as Secretary of   )
  Defense,               )
                               )
       Defendant.    )

## MEMORANDUM OPINION

This action arose after Marina Vanyan ("Vanyan" or "plaintiff") was removed from her position as an employee of the Department of Defense ("defendant").  Plaintiff claims that her removal was the result of disability discrimination and retaliation, in violation of the Rehabilitation Act of 1973 ("RA" or "the Act"), 29 U.S.C. § 701 et seq.  Defendant moved for summary judgment on both counts, arguing that plaintiff's removal was the result of her failure to maintain a regular work schedule.  For the reasons that follow, defendant's Motion for Summary Judgment will be granted.

## I.  BACKGROUND

In October 2003, the Defense Threat Reduction Agency ("DTRA" or "the Agency"), a branch of the Department of Defense, hired plaintiff as a Training Instructor — occasionally referred to in the record as a Language Instructor or Language Specialist

— to provide Russian language instruction and mission support to military linguists assigned to the Strategic Arms Reduction Treaty ("START").  Am. Compl. ¶ 13.  Her core objective was to master the specialized vocabulary of START in both English and Russian, and then to pass that knowledge to military linguists and Foreign Area Officers tasked with conducting START-related inspections and communicating with their Russian counterparts. See Mem. in Supp. of Def.'s Mot. for Summ. J. ("Def.'s Mem."), Ex. 1 ("Vanyan Dep."), at 10.  To accomplish this objective, plaintiff taught classes and sometimes provided ad hoc mission support, particularly for missions to recruit new linguists. Id. at 10-13; Def.'s Mem., Ex. 2 ("Position Description"), at 2-6.  Although travel was not a significant portion of her job, it was disclosed as a requirement at the time of her interview, see Def.'s Mem., Ex. 1, at 32, 41, a fact reflected in her Position Description,[1] see Def.'s Mem., Ex. 2, at 2-6.  When asked about the travel requirement, plaintiff indicated that she would have no problem fulfilling it.  See Def.'s Mem., Ex. 3 ("Ellis

---

[1] The Position Description was divided into four sections, one of which ("Factors") noted that the Instructor position included temporary duty (TDY), travel by airplane, and travel to distant locations.  See Def.'s Mem., Ex. 2.  Factor 9, in particular, reads: "For TDY instruction and linguist performance evaluations, the work will involve some travel. The incumbent's work may involve moderate risks such as travel by airliner or vehicle to various remote sites; as well as transportation by military aircraft." (Emphasis added.)

Dep."), at 38.  The record confirms that plaintiff had been able to travel extensively in her previous position with the Department of State, which she left when the travel component began to conflict with her ability to care for her two young children.  See Def.'s Mem., Ex. 1, at 30.

When plaintiff began working for DTRA, in October 2003, she was supervised by Richard Gibby, the Branch Chief, and Irina "Sheree" Ellis, a senior linguist who served as the team leader for the Russian linguists.  See id. at 24, 83.  The team consisted of plaintiff and two other Training Instructors, Andrei Anzimirov and Ramaz Kvavilashvili.[2]  Def.'s Mem., Ex. 3, at 13.  Gibby was eventually replaced as Branch Chief by Yuri Boguslavsky, who in turn reported to Victoria Krikorian, the new Division Chief.  Around this time, Ellis received a promotion to Deputy Branch Chief, and she became plaintiff's first-line supervisor as a result.  See Am. Compl. ¶ 13.  This series of managerial changes seems to have precipitated many of the issues giving rise to the instant action.

In 2006, plaintiff began to openly discuss her fear of flying with others at DTRA, including Ellis and Krikorian, see Def.'s Mem., Ex. 1, at 51, 53, 55, and it became clear over time

---

[2] The record is clear that both of plaintiff's colleagues traveled domestically and internationally for mission training and recruitment purposes during the period that she was employed.  See Def.'s Mem., Ex. 4 ("Training Travel Order Log").

that plaintiff's fear would interfere with her job functions. On August 29, 2007, plaintiff met with Boguslavsky in his office to inform him that certain health issues precluded her from flying, though she expressed some measure of willingness to accept assignments involving land travel only.[3]  Id. at 73-74. She recalls that Boguslavsky's reaction was to become "very, very angry," even threatening to seek out assignments for her that required flying as a means of retaliating.  Id. at 74-75. Plaintiff describes the acrimonious meeting as "a crucial point in changing everything that ruined [her] career . . . and [her] health."  Id. at 83.  From that point forward, plaintiff believes Boguslavksy "declar[ed] war" on her.  Id.

On October 22, 2007, Ellis informed plaintiff that she would need to make arrangements to support a three-day recruiting trip to Texas.  See Def.'s Mem., Ex. 1, at 49, 51; Def.'s Mem., Ex. 6 ("Email Chain").  When Ellis followed up a few weeks later, plaintiff responded that she would not be able to go because of her fear of flying, which she attributed to entering a "very painful perimenopausal stage," nor would she

---

[3] Plaintiff seems to suggest that a number of other topics were discussed in the meeting with Boguslavsky, but she struggled to identify exactly which ones (and their relative significance). See Def.'s Mem., Ex. 1, at 82.

travel by airplane for any other mission.[4]  See Def.'s Mem., Ex. 1, at 61.  On November 13, 2007, plaintiff produced a physician's note, recommending "no flights for three months until [plaintiff could be] evaluated and treated for flight anxiety and phobia."  Def.'s Mem., Ex. 7 ("Physician's Note"). The physician strongly encouraged plaintiff to see a psychiatrist because he lacked the necessary expertise as a general practitioner.[5]  See Def.'s Mem., Ex. 1, at 65.  The note led to another meeting between plaintiff, Boguslavsky, Ellis, and a representative from Human Resources.  Id.

During this period, plaintiff's uneven attendance caught the attention of her supervisors.  Plaintiff herself testified that it was not uncommon for her to arrive late for work once or twice per week.  See Def.'s Mem., Ex. 1, at 89.  Plaintiff also testified that her penchant for tardiness was never a problem under Gibby and in fact was common practice among the other Instructors.  On August 30, 2007, after a change in management, Ellis sent Boguslavsky an email detailing office-wide attendance issues but singled out plaintiff for her tardiness and

---

[4] Plaintiff did indicate that she was "prepared to discuss how [she could] contribute in lieu of travel."  Def.'s Mem., Ex. 6.

[5] By her own admission, plaintiff did not act on her physician's advice for approximately six months.  Def.'s Mem., Ex. 1, at 67-68.  Instead, she attempted to self-medicate using certain traditional and holistic remedies.

unresponsiveness to informal warnings.  See Def.'s Mem., Ex. 11 ("Email Chain").  When confronted individually about her tardiness, plaintiff told Ellis that being fifteen minutes late to government work was hardly a big deal.  Def.'s Mem., Ex. 1, at 87-90 ("And I remember saying to [Ellis] that even — since I was a court interpreter in the past, I said to her that even in courts, if a person is 15 minutes late, judges sometimes would wait.  So to me, 15 minutes was not a big deal as long as I can make it up.").  Plaintiff's tardiness continued and caused each of her first-line, second-line, and third-line supervisors to warn her that she held a full-time position requiring regular attendance.  See Def.'s Mem., Ex. 13 ("Reinhart Dep."), at 78. Plaintiff especially chafed at the newly imposed condition that she send emails documenting her arrival and departure times, and she expressed her contempt in a number of ways, including in an email to Ellis on October 27, 2007, which stated, "I'm going to pee and then leave. Depending on how long that process might take, you could consider that I've worked overtime today." Def.'s Mem., Ex. 15 ("Email Chain").

This email, and other instances like it, led to a meeting with Krikorian regarding plaintiff's "unprofessional conduct towards her supervisors."  Def.'s Mem., Ex. 12 ("Krikorian Memorandum").  Plaintiff disputes Krikorian's characterization

of the meeting, suggesting instead that it was held to scold her for lodging an unrelated EEO complaint directed at Boguslavsky. See Def.'s Mem., Ex. 1, at 98.

On March 25, 2008, more than three months after plaintiff submitted the physician's note, Boguslavsky sent plaintiff an email requesting "an official doctor's evaluation" per the contents of the note.[6]  Def.'s Mem., Ex. 1, at 115-16.  Spurred by this request and Ellis's encouragement, plaintiff met with Aaron Hamilton, an employee in the EEO office, to discuss how to formally make a reasonable accommodation request ("RAR").  Id. at 137-38.  On April 18, 2008, plaintiff submitted her first RAR to DTRA, in which she requested that she be allowed to fulfill her job duties by use of ground transportation until her fear of flying could be properly evaluated and treated.  Def.'s Mem., Ex. 10 ("Reasonable Accommodation Request").  Plaintiff followed with a supporting letter from Dr. Virginia Revere, a clinical psychologist, who diagnosed plaintiff's medical condition as

---

[6] Such concerns about the severity of plaintiff's fear of flying were not unfounded.  Clear evidence in the record shows that plaintiff was able to fly with her family to Florida for vacation on several occasions, including as late as 2008. Def.'s Mem., Ex. 1, at 56-57.  In the past, plaintiff had also made statements to Ellis about how easy it is to fake a mental illness.  Def.'s Mem., Ex. 3, at 24.  Defendant, however, has not at any point disputed that plaintiff suffers from a disability within the meaning of the Rehabilitation Act.

panic disorder with agoraphobia.  See Def.'s Mem., Ex. 1, at
123-25.  DTRA took plaintiff's RAR under consideration.

Plaintiff's attendance issues resurfaced in December 2008.
Def.'s Mem., Ex. 1, at 150-53.  Specifically, while Ellis was
out of the office for several weeks, plaintiff left work early
multiple times without first requesting leave through the
appropriate channels.  See id.  Plaintiff explains that her
daughter was home sick with pneumonia at the time, but admits
that she "ended up taking much more leave than [she] probably
should have."  Id.  Plaintiff also admits that she failed to
request leave and subsequently "forgot to record it."  Id. at
153.  Plaintiff compounded her mistakes by signing inaccurate
timesheets and submitting them for payment.  See id. at 151-52.
When Ellis returned the next month, she discovered the
inaccuracies and instructed plaintiff to correct her time and
attendance records.  Id.  Ellis followed up this incident by
sending plaintiff a Letter of Requirement on February 27, 2009,
regarding her "failure to report for duty at the established
time, excessive unscheduled leave use, and concerns with the
hours worked documented by [plaintiff] on [her] timecards."
Def.'s Mem., Ex. 16 ("Letter of Requirement").  The Letter
advised plaintiff of her duty-hours, reminded her of proper
procedures for requesting leave, and reiterated that she was

required to send emails to Ellis at the beginning and end of the work day to verify her attendance.  See id.  Plaintiff viewed the Letter as reprisal for her involvement in ongoing, largely unrelated EEO activity directed at Krikorian and Boguslavsky.

On April 28, 2009, at the direction of someone in the EEO office, plaintiff submitted her second RAR to DTRA, in which she renewed her request for an accommodation that would allow her to fulfill the duties of her position "without being required to fly."  Def.'s Mem., Ex. 17 ("Reasonable Accommodation Request").  After receiving notice that additional supporting documentation was needed, plaintiff returned to Dr. Revere with a package of agency documents, including a position description.  See Def.'s Mem., Ex. 1, at 170-71.  Dr. Revere thereafter produced a letter concluding that "[r]easonable accommodations would include travel by land transportation only" but otherwise "[plaintiff] continues to be able to function without problems in teaching, and is able to fulfill her job requirements, except for Factor 9 [air travel]."  Am. Compl. ¶ 22.  DTRA again took plaintiff's RAR under consideration.

In the meantime, things went downhill for plaintiff.  She received a reprimand for insolence and poor attendance, and she was denied permission to attend a physical training session.  On August 21, 2009, DTRA denied plaintiff's pending RAR on the

grounds that "travel by airplane [was] an essential function of [her] position." Def.'s Mem., Ex. 18 ("Denial Letter"). Plaintiff received the news upon returning from a family vacation a few days later. Def.'s Mem., Ex. 1, at 182. Although there is some dispute as to how many days plaintiff worked after her RAR was denied, plaintiff concedes that she stopped reporting to work entirely by the end of the month. Id. at 183. She identifies the tipping point as another assignment requiring air travel (to San Francisco) coupled with Dr. Revere's suggestion that her work environment was aggravating her condition. Id. at 183, 186.

Plaintiff never returned to work at DTRA. From September 2, 2009, until September 29, 2009, she relied on approved annual, sick, and donated leave. Def.'s Mem., Ex. 19 ("Removal Decision"). When DTRA advised plaintiff that such leave was exhausted, she followed a suggestion to request leave without pay under the Family and Medical Leave Act ("FMLA") in order to avoid a designation as absent without leave ("AWOL"). On November 10, 2009, plaintiff submitted an FMLA request for 480 hours of leave without pay covering the period from September 25, 2009, through December 18, 2009. Id. Her request was accompanied by documentation from Dr. Sarah Iannucci, a certified psychiatrist, noting that "the intensity of

10

[plaintiff's] symptoms preclude[d] her from being able to safely perform any of her job functions" and estimating that plaintiff could return to work within "three to six months [of] September 2, 2009." Def.'s Mem., Ex. 1, at 191-93. On December 9, 2009, Ellis sent a letter informing plaintiff that her three-month entitlement to leave without pay under FMLA would expire on December 22, 2009. Def.'s Mem., Ex. 19. Accordingly, Ellis requested that plaintiff return to duty on December 23, 2009, explaining that she "occup[ied] a fulltime position and [her] services [were] required." Id. Plaintiff was asked to do so without accommodation in light of the Reasonable Accommodation Request Board's denial of her appeal of the decision that the requirement to travel by airplane was an essential function of the Instructor position. See Def.'s Mem., Ex. 20 ("Appeal Letter").

Plaintiff recalls that the return-to-work letter "worsened [her] condition so much." Def.'s Mem., Ex. 1, at 194. As a result, on December 23, 2009, plaintiff submitted a request for further leave without pay, again accompanied by a letter from Dr. Iannucci. Id. at 195. DTRA granted plaintiff's request through January 8, 2010, after which plaintiff received donated sick leave through the voluntary leave transfer program that extended her approved leave to January 25, 2010. Three days

before her donated leave was to expire, plaintiff submitted a final letter from Dr. Iannucci indicating that plaintiff's medical condition was improving and that she could return to work "by the end of February 2010" with several accommodations, including "limited work hours and flexibility in scheduling, transfer to a different department or designation to a new supervisor, and . . . no mandatory travel." Am. Compl. ¶¶ 32-33. DTRA sent another notice advising plaintiff that a failure to return to duty would result in being carried in AWOL status as of January 26, 2010. Plaintiff claims that DTRA never responded directly to her final request for reasonable accommodations; defendant claims that the letter from Dr. Iannucci was not a formal request.

When plaintiff again failed to return to duty, she received a Notice of Proposed Removal on March 12, 2010.[7] Def.'s Mem., Ex. 22 ("Notice of Proposed Removal"). Plaintiff objected to the Notice, arguing that she was a qualified individual with a disability whose extended absence was the result of the Agency's failure to provide the requested accommodation. See Def.'s Mem., Ex. 19. Plaintiff further argued that the proposed

---

[7] The Notice read in pertinent part: "If you return to duty during the notice period, you will be carried in a regular duty status. If you do not return to duty during the notice period, you will be carried in an absent without leave status until such time as a decision concerning this matter is rendered."

removal was retaliatory.  Neither argument gained traction with the deciding official, Kenneth Keating.

On June 11, 2010, plaintiff was finally removed from her position for failing to maintain a regular work schedule, having remained AWOL for a total of 792 duty-hours.  Id.  The Decision on Proposed Removal cited a series of factors, including plaintiff's length of service, prior job performance, AWOL status, and the effect of her lengthy and continued absence on her ability to perform the duties of her position.  Id.

On July 10, 2010, plaintiff appealed her removal to the Merit Systems Protection Board ("MSPB").  The MSPB affirmed the agency action removing plaintiff from her position based on her failure to maintain a regular work schedule.  Def.'s Mem., Ex. 23 ("MSPB Decision").  In reaching its decision, the Administrative Judge ("AJ") concluded that plaintiff could not have performed the essential functions of her position, regardless of whether DTRA accommodated her request to be excused from flying.  Id. at 5.  The AJ further concluded that plaintiff had not established a nexus between her protected EEO activity and her removal.  Id. at 11.

On February 6, 2012, plaintiff filed a petition with the Equal Employment Opportunity Commission ("EEOC"), seeking review of the MSPB's decision.  The EEOC affirmed the decision, finding

13

that travel abroad by airplane was an essential function of plaintiff's position; that she did not identify a vacant, funded position for which she could have performed the essential functions, with or without reasonable accommodation; and that she could not rebut the DTRA's "legitimate, nondiscriminatory reason" for her removal — that is, her failure to maintain a regular work schedule.  See Def.'s Mem., Ex. 24 ("EEOC Opinion").  The EEOC opinion marked the conclusion of the administrative process.[8]

On March, 20, 2013, plaintiff timely filed the instant action, challenging only the decision to remove her from employment at DTRA, which plaintiff alleges was the result of discrimination on the basis of her disability, see Am. Compl. ¶ 38, and retaliation for requesting and pursuing a reasonable accommodation of her disability, see id. ¶ 41, both in violation of the Rehabilitation Act.  Among other relief, plaintiff seeks back pay and front pay, compensatory damages in the amount of

---

[8] Plaintiff is still actively involved in a parallel administrative proceeding, in which she is pursuing claims of unlawful harassment based on gender and disability as well as retaliation for engaging in protected EEO activity.  That proceeding involves a different set of underlying adverse employment actions — that is, plaintiff is not challenging her removal in that proceeding.  For this reason, any administrative documents or evidence relating to that proceeding are not directly relevant to the issues presented in the instant action.

$300,000, attorneys' fees and costs, and "revers[al]" of DTRA's removal decision. Id. ¶ 1, 43.

## II.   DISCUSSION

Defendant has moved for summary judgment on both counts. Because the scope of this action is limited to plaintiff's removal from her employment, and defendant has advanced attendance-based reasons for the removal decision that are strongly supported in the record and not rebutted by plaintiff's evidence, the Court concludes that defendant is entitled to summary judgment on both counts.

### A. Standard of Review

Summary judgment is appropriate where the record demonstrates "that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Accordingly, the question on summary judgment is "whether a reasonable jury could find in favor of the non-moving party, taking all inferences to be drawn from the underlying facts in the light most favorable to the non-movant[.]" In re Apex Express, 190 F.3d 624, 633 (4th Cir. 1999). To survive a summary judgment motion, "[t]he disputed facts must be material to an issue necessary for the proper resolution of the case, and the quality and quantity of the evidence offered to create a question of fact must be adequate

15

to support a jury verdict." Thompson Everett, Inc. v. Nat'l Cable Adver., L.P., 57 F.3d 1317, 1323 (4th Cir. 1995) (citation omitted). That means the non-moving party may not rest upon a "mere scintilla" of evidence, but must instead offer specific facts showing that there is a genuine issue for trial. See Celotex, 477 U.S. at 324; accord Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

### B. Rehabilitation Act Claims

The Rehabilitation Act prohibits federal agencies from discriminating against qualified employees based on a disability and provides the exclusive avenue for remedying such discrimination. See 29 U.S.C. §§ 791, 794a(a)(1). When there is no direct evidence of discrimination or retaliation, the familiar burden-shifting analysis applies to actions brought under the Act. To survive a motion for summary judgment, a plaintiff must first establish a prima facie case of discrimination or retaliation. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 n.13 (1973); Luther v. Gutierrez, 618 F. Supp. 2d 483 (E.D. Va. 2009) (applying McDonnell Douglas to a Rehabilitation Act claim). The burden then shifts to the defendant to proffer a legitimate, non-discriminatory or non-retaliatory reason for the challenged employment action. See McDonnell Douglas, 411 U.S. at 802 n.13; see also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133 (2000). This

16

burden is one of production, not persuasion, and therefore "involve[s] no credibility assessment." See Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253, 256 (1981). At the final step in the analysis, the plaintiff must produce some evidence showing that the defendant's proffered reason is pretextual. See Reeves, 530 U.S. at 142.

### 1. Disability Discrimination

In Count I of the Amended Complaint, plaintiff claims that her removal violated the Rehabilitation Act's prohibition against disability discrimination. The Act provides that "[n]o otherwise qualified individual with a disability" may "be subjected to discrimination" by any federal agency "solely by reason of her or his disability." 29 U.S.C. § 794(a). Accordingly, to make a prima facie showing of discrimination, plaintiff must establish (1) that she has a qualifying disability, (2) that she is otherwise qualified for the position in question, and (3) that she was excluded from the position solely by reason of her disability.[9] See Doe v. Univ. of Md. Med. Sys. Corp., 50 F.3d 1261, 1264-65 (4th Cir. 1995) (citing Gates v. Rowland, 39 F.3d 1439, 1445 (9th Cir. 1994)). A person who is "otherwise qualified" is one who could perform the

---

[9] The Act specifies that the substantive standards used to determine whether a violation has occurred under the Rehabilitation Act are the same as the standards used under the Americans with Disabilities Act of 1990. 29 U.S.C. § 794(d).

17

essential functions of her position with or without reasonable accommodations from her employer.  See 42 U.S.C. § 12111(8).

Here, defendant does not dispute that plaintiff's diagnosis of panic disorder with agoraphobia constitutes a disability within the meaning of the Act.  See Def.'s Mem. 21.  Plaintiff's prima facie case instead hinges on whether she has made a sufficient showing that she could have performed the essential functions of her job had reasonable accommodations been made and whether her disability was the sole reason for which she was removed.  A careful review of the record compels the conclusion that plaintiff has done neither.

Plaintiff has failed to produce sufficient evidence that she could perform perhaps the most essential function of all — regularly showing up to work — with or without reasonable accommodations from defendant.  See Doe, 50 F.3d at 1264-65.  It is hardly controversial that attendance is an essential function of most employment positions.  See Tyndall v. Nat'l Educ. Ctrs., 31 F.3d 209, 213 (4th Cir. 1994) (concluding that "a regular and reliable level of attendance is a necessary element of most jobs" and that "[a]n employee who cannot meet the attendance requirements of the job at issue cannot be considered a 'qualified' individual for purposes of the Americans with Disabilities Act"); Carr v. Reno, 23 F.3d 525, 529 (D.C. Cir.

18

1994) (recognizing that "coming to work regularly" is "an essential function" of any job); Law v. U.S. Postal Serv., 852 F.2d 1278, 1279-80 (Fed. Cir. 1988) (concluding that attendance is a minimum function of any job).  The record reflects that plaintiff's attendance suffered significantly before her employment at DTRA was terminated.  Plaintiff admits that she did not come to work at all after her generous approved leave expired, choosing to remain AWOL for the four months preceding her removal.  See Def.'s Mem., Ex. 22.  The evidence clearly shows that plaintiff made a conscious decision not to return, as defendant sent her numerous notices and requests to return to duty, one of which warned her that failure to comply would lead to placement in AWOL status.  See Def.'s Mem., Ex. 1, at 194-202.  Plaintiff also admits that she did not heed these notices and requests even after responding to treatment for her condition and experiencing physical improvements.  This series of events is documented in a comprehensive Notice of Proposed Removal, which gave plaintiff more than three months to alter course before any final action was taken.  Id.

Nor has plaintiff produced evidence that approval of her requested accommodation — assignments involving land travel only — would have mitigated her serious attendance issues.  Numerous instances in the record confirm that her attendance issues pre-

19

dated the worsening of her medical condition in 2007.  For
example, plaintiff concedes that she often came to work late
when Gibby was her supervisor and that Ellis would cover for her
by turning on her office light at 8:00 a.m.  See Def.'s Mem.,
Ex. 1, at 91-92.  Plaintiff also concedes that she never thought
to seek her supervisor's permission before arriving late.  Id.
Moreover, even after notifying others at DTRA of her condition,
plaintiff's attendance issues persisted independently of any
particular instances of impending travel.  She acknowledges that
her failure to keep proper time and attendance records and
excessive use of unscheduled leave in December 2008 had nothing
to do with her fear of flying.  See id. at 151-52.  Accordingly,
plaintiff cannot convincingly show that her attendance issues,
even in the period immediately preceding her removal, were
intertwined with her disability.  In other words, had the
requested travel accommodation been made, it is clear that
plaintiff would still have been unable to perform an essential
function of her job.  See Tyndall, 31 F.3d at 213 (holding that
a plaintiff must be able to "meet all of [her] program's
requirements in spite of [her] handicap").

     Plaintiff offers a few explanations for her poor
attendance, none of which are consistent with the record.
Plaintiff suggests that her absence starting September 2, 2009,

20

and continuing until her removal, was attributable only to
DTRA's failure to guarantee that she would not be required to
fly, Pl.'s Opp. to Def.'s Mot. for Summ. J. ("Opp.") 18, but her
long history of attendance issues in conjunction with the letter
from Dr. Iannucci establish that plaintiff was not ready and
able to return to work right away.  Plaintiff also suggests that
her attendance issues were overblown by hostile supervisors, but
her only supporting evidence derives from an unrelated
intraoffice dispute, involving several parties, which is already
the subject of a parallel administrative proceeding.  In the
end, plaintiff has not produced sufficient evidence that she was
otherwise qualified for her position, as she must to state a
prima facie case.  See Doe, 50 F.3d at 1264-65.

   Plaintiff has likewise failed to show that she was removed
solely on the basis of her disability.  See id.  The record
instead contains multiple official communications indicating
that she was removed for legitimate attendance-based reasons.
On August 20, 2007, Ellis first sent Boguslavsky an email on the
subject of plaintiff's tardiness.  Def.'s Mem., Ex. 11 ("Email
Chain").  Plaintiff was subsequently required to document her
arrival and departure time by sending emails to a supervisor.
See Def.'s Mem., Ex. 1, at 104.  On February 27, 2009, plaintiff
received a Letter of Requirement regarding her chronic tardiness

21

and shoddy timekeeping practices.  Def.'s Mem., Ex. 16.  Then,

near the end of August 2009, plaintiff left work and never came

back.  This last event led to an exhaustive Notice of Proposed

Removal on March 12, 2010, which explicitly cited plaintiff's

failure to appear for duty following the expiration of her

generous approved leave.  Def.'s Mem., Ex. 22.  The final

Decision on Proposed Removal, issued on June 11, 2010, is

equally clear and supported by numerous detailed factual

findings.  Def.'s Mem., Ex. 19.  In all, plaintiff was carried

in AWOL status for 792 duty-hours before her removal.  Cf.

Luther, 618 F. Supp. 2d at 493 ("[T]he Rehabilitation Act does

not serve to immunize a disabled employee from discipline in the

workplace based on a violation of a valid work rule applied to

all employees." (citation omitted)).  If anything, the record

proves that defendant went to great lengths to give plaintiff

ample time to seek treatment for her condition.  Plaintiff is

therefore unable to show that she was removed solely because of

her disability.

Even if she could make out a prima facie case, plaintiff's

claim would nonetheless fail because she is unable to rebut

defendant's legitimate, non-discriminatory reasons for her

removal — namely, failing to maintain a regular work schedule

after her leave expired.  See Reeves, 530 U.S. at 142.  There is

no clear evidence of pretext in the record.  To the contrary, the government has made a strong showing that continuing to operate with only two-thirds of its Russian Language Instructors seriously hampered its ability to perform a critical mission. Moreover, plaintiff's colleagues clearly understood her removal to be the result of her refusal to report for duty as opposed to defendant's hostile attitude toward her disability.  Def.'s Mem., Ex. 5 ("Kvavilashvili Dep."), at 30 ("And when I asked what happened, I was told that she stopped coming to work.  And when a person doesn't show up for work, even though it's very hard to get fired in the government, that's what happens when you don't show up for work.").  Plaintiff responds that her fellow Instructors had similar attendance problems but were not punished in kind, Opp. 9, 17, calling herself a victim of "post hoc application of neutral rules (regarding tardiness and absenteeism)," id. 18-19.  It is true that her colleagues, especially Anzimirov, were not models of punctuality.  Still, the record gives no indication that their problems were of the same magnitude as hers, nor do they stand accused of submitting inaccurate timesheets and being insolent with supervisors who enforced attendance rules.  See Def.'s Mem., Ex. 15. Significantly, none of plaintiff's co-workers kept their positions after remaining AWOL for any length of time.

23

As a final matter, plaintiff uses her Opposition to restyle Count I as a claim for failure to accommodate, and attempts to turn the focus to DTRA's denial of her RARs rather than its decision to remove her.  See Opp. 16-20.  Yet, plaintiff made no such claim in her Amended Complaint, which specifically alleges that defendant discriminated against her "[b]y removing" her. Am. Compl. ¶ 38; see also id. ¶ 1 ("[Plaintiff] focuses this case on her removal from employment . . . .").  It is therefore not an appropriate ground for relief.  Moreover, although plaintiff was ostensibly proceeding pro se when she drafted the Amended Complaint, current counsel could have requested leave to amend a second time upon entering an appearance.

In any event, plaintiff could not succeed on the merits of a failure-to-accommodate claim.  See 42 U.S.C. § 12112(b)(5)(A) (requiring federal employers to "mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability"); see also 29 U.S.C. § 791(g) (incorporating that standard in the Rehabilitation Act).  The elements of a prima facie case for failure to accommodate require a plaintiff to show, among other things, that she could perform the essential functions of her position with reasonable accommodations and that her employer denied her request for such accommodations.  See Wilson v.

24

Dollar Gen. Corp., 717 F.3d 337, 345 (4th Cir. 2013).

Plaintiff's inability to show that she was otherwise qualified

is therefore a barrier to success under this theory as well.

Plaintiff also cannot show that defendant was unreasonable to

conclude that her request to travel by land only could not be

accommodated because air travel was an essential function of her

position.  See Def.'s Mem., Ex. 5, at 30 (explaining the

importance of professional development trips to Russia).

Defendant even engaged with plaintiff in an interactive process

to identify a vacant position to which she could be reassigned,

but found nothing suitable.  See Def.'s Mem., Ex. 19.

    Plaintiff repeatedly returns to Dr. Iannucci's letter,

dated January 22, 2010, in which she "estimate[d] that

[plaintiff] would be mentally and physically capable of

returning to work with some restrictions and reasonable

accommodations," including "limited work hours and flexibility

in scheduling, transfer to a different department or designation

to a new supervisor, and  . . . no mandatory travel," by the end

of the following month.  Opp. 13, 24.  Plaintiff construes this

letter as a third RAR and argues that had these additional

accommodations been made, she was ready and willing to return to

work; however, plaintiff never submitted a formal RAR based on

Dr. Ianucci's letter, even though she was very familiar with the

25

process.  Moreover, defendant's concession that it did not
construe the letter as a formal RAR and therefore did not engage
in the usual interactive process is not sufficient evidence,
standing alone, to support a viable claim.  See Wells v. BAE
Sys. Norfolk Ship Repair, 483 F. Supp. 2d 497, 511 (E.D. Va.
2007) aff'd, 250 F. App'x 552 (4th Cir. 2007) (internal
citations omitted) (holding that an employee must demonstrate
that the employer's failure to engage in the interactive process
resulted in the failure to identify an appropriate accommodation
for the qualified employee).  Nor is it presumptively
discriminatory for an employer in defendant's position to refuse
a plaintiff's request for an accommodation that it correctly
deems unreasonable.  See Fink v. Richmond, 405 F. App'x 719, 723
(4th Cir. 2010) (citing Gile v. United Airlines, Inc., 95 F.3d
492, 499 (7th Cir. 1996) ("Importantly, however, the ADA and the
Rehabilitation Act do not require that an employer provide a
disabled employee with a perfect accommodation or an
accommodation most preferable to the employee.")).  There can be
little doubt that accommodating "limited work hours, flexibility
in scheduling, . . . and no mandatory travel" would have proved
unduly burdensome in light of DTRA's specific charge and the
classroom and mission-support duties assigned to its
Instructors.

For these reasons, plaintiff has not created an issue for the jury with respect to any element of her disability discrimination claim and defendant is therefore entitled to summary judgment.

## 2. Retaliation

In Count II of the Amended Complaint, plaintiff claims that her removal also violated the Rehabilitation Act's prohibition against retaliation.[10]  To establish a prima facie case of retaliation, plaintiff must show (1) that she engaged in a protected activity, (2) that her employer acted in an adverse manner, and (3) that the protected activity was causally connected to the adverse action.  See Holland v. Wash. Homes, Inc., 487 F.3d 208, 218 (4th Cir. 2007).  To satisfy the last element plaintiff must show that defendant would not have removed her but for a desire to retaliate against her for engaging in a protected activity.  See Univ. of Tex. Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2528, 2533 (2013) (declining to adopt the less-stringent "motivating factor" standard used in other contexts).

_____

[10] Although the Rehabilitation Act does not have a specific antiretaliation provision, it incorporates the remedies applicable under the Americans with Disabilities Act, including 42 U.S.C. § 12203(a), which makes it unlawful to retaliate against individuals for making a charge, testifying, assisting, or participating in an investigation, proceeding, or hearing regarding charges of disability discrimination.  29 U.S.C. § 794a.

Plaintiff identifies a number of protected activities, including disclosure of her disability to Boguslavsky (and other supervisors) and submitting two RARs to DTRA. Opp. 26. Plaintiff also alludes to several additional contacts with EEO staff, the bulk of which seem to have stemmed from an intraoffice conflict between lower-level employees (like plaintiff) and Krikorian, Boguslavsky, and Ellis, who were accused of using oppressive management tactics. Id. at 27.

Plaintiff's claim fails for two reasons. First, most of the protected activities she relies upon have little to do with the two RARs that are at the core of this action. Although plaintiff made or joined in several EEO complaints regarding her supervisors' management style, which she alleges aggravated her condition, such activities are the subject of a parallel administrative proceeding; they are not before this Court. Second, plaintiff does not directly allege — much less offer proof of — a causal connection between either the disclosure of her disability or her submission of two RARs and her removal. In fact, the record clearly shows that more than a year passed between any of her protected activities and her removal. Without a temporal inference, plaintiff must offer direct evidence of causation, but she has offered none. Accordingly, defendant is entitled to summary judgment.

28

C. <u>Request for Reinstatement</u>

In the Amended Complaint, plaintiff asks the Court "to reverse [her] removal from the employment." Am. Compl. ¶ 1. This in effect a request for reinstatement. Although plaintiff does not invoke this request in her Opposition, the Court will address it to ensure that the record is complete.

Plaintiff's request for reinstatement requires review of the MSPB's decision, which upheld her removal notwithstanding her claims of discrimination. The usual rule is that the Federal Circuit has exclusive jurisdiction to review MSPB decisions concerning claims of adverse federal personnel actions; however, a federal district court may review MSPB decisions in actions where, as here, the plaintiff has also raised a claim of discrimination or retaliation. See <u>Afifi v. U.S. Dep't of Interior</u>, 924 F.2d 61, 62-63 (4th Cir. 1991). In such actions, a district court's review of any discrimination claims presented before the MSPB is limited to the administrative record and is thus subject to a more deferential standard established by statute. See 5 U.S.C. § 7703(c). The MSPB's decision will only be overturned if it was arbitrary, capricious, obtained without procedures required by law, or unsupported by substantial evidence. <u>Id.</u>

The record reflects that the MSPB's decision was neither arbitrary, capricious, nor unsupported by the evidence, nor did

the MSPB violate any procedures required by law.  Moreover, plaintiff had counsel throughout the process.  Ultimately, the MSPB's dual conclusions that plaintiff could not have performed the essential functions of her position, regardless of whether DTRA accommodated her request to be excused from flying, see Def.'s Mem., Ex. 23, at 5, and that plaintiff had not established a nexus between her protected EEO activity and her removal, id. at 11, are well supported in the record.  This Court therefore finds no basis to overturn those conclusions.

### III.   CONCLUSION

For the reasons stated above, defendant's Motion for Summary Judgment will be granted by an appropriate Order to be issued with this Memorandum Opinion.

Entered this  1st  day of April, 2014.

Alexandria, Virginia

/s/

Leonie M. Brinkema
United States District Judge